Citation Nr: AXXXXXXXX
Decision Date: 06/30/21 Archive Date: 06/30/21

DOCKET NO. 200505-87663
DATE: June 30, 2021

ORDER

The application to reopen the previously denied claim for entitlement to service connection for tinnitus is granted.

The application to reopen the previously denied claim for entitlement to service connection for bilateral hearing loss is granted.

Entitlement to service connection for tinnitus is denied.

Entitlement to service connection for bilateral hearing loss is denied.

Entitlement to service connection for neuropathy, left upper extremity is denied.

Entitlement to service connection for neuropathy, right upper extremity is denied. is denied.

Entitlement to service connection for neuropathy, left lower extremity is denied.

Entitlement to service connection for neuropathy, right lower extremity is denied.

Entitlement to an increased disability rating in excess of 20 percent for degenerative arthritis of the lumbar spine is denied.

Entitlement to an increased disability rating in excess of 20 percent for degenerative arthritis of the cervical spine is denied.

FINDINGS OF FACT

1. In a September 1979 rating decision, the RO, inter alia, denied the Veteran's claim for entitlement to service connection for tinnitus and bilateral hearing loss. The Veteran neither appealed this decision nor submitted new and material evidence within the one-year appeal period.

2. Evidence received since the September 1979 rating decision relates to an unestablished fact necessary to substantiate the claim for service connection for tinnitus and bilateral hearing loss and raises a reasonable possibility of substantiating the claims.

3. There is clear and unmistakable evidence that the Veteran's tinnitus pre-existed service, and clear and unmistakable evidence that the preexisting tinnitus was not aggravated by service.

4. There is clear and unmistakable evidence that the Veteran's bilateral hearing loss pre-existed service, and clear and unmistakable evidence that the preexisting bilateral hearing loss was not aggravated by service.

5. The Veteran's diagnosed neuropathy, left upper extremity, has been associated with his diabetes mellitus type II which is not service connected.

6. The Veteran's diagnosed neuropathy, right upper extremity, has been associated with his diabetes mellitus type II which is not service connected.

7. The Veteran's diagnosed neuropathy, left lower extremity, has been associated with his diabetes mellitus type II which is not service connected.

8. The Veteran's diagnosed neuropathy, right lower extremity, has been associated with his diabetes mellitus type II which is not service connected.

9. For the entire period on appeal, the Veteran's lumbosacral spine disability manifested in symptoms more nearly approximating constant worsening back pain, forward flexion of the thoracolumbar spine greater than 30 degrees, or total combined range of motion of the thoracolumbar spine not greater than 120 degrees. There was no ankylosis, or incapacitating episodes due to intervertebral disc syndrome (IVDS) requiring bed rest prescribed by a physician.

10. For the entire period on appeal, the Veteran's service-connected degenerative arthritis of the cervical spine did not more nearly approximate forward flexion of 15 degrees or less, or favorable ankylosis of the entire cervical spine, or incapacitating episodes due to IVDS.

CONCLUSIONS OF LAW

1. The September 1979 rating decision that denied the claim for entitlement to service connection for tinnitus and bilateral hearing loss is final. 38 U.S.C. § 7105(c); 38 C.F.R. §§ 3.156(b), 20.1103.

2. The evidence received since the September 1979 rating decision is new and material and sufficient to reopen the claims of service connection for tinnitus and bilateral hearing loss. 38 U.S.C. § 5108; 38 C.F.R. § 3.156(a).

3. The criteria for service connection for tinnitus have not been met. 38 U.S.C. §§ 1111, 1131; 38 C.F.R. §§ 3.303(a), 3.304.

4. The criteria for service connection for bilateral hearing loss have not been met. 38 U.S.C. §§ 1111, 1131; 38 C.F.R. §§ 3.303(a), 3.304.

5. The criteria for service connection for neuropathy, left upper extremity secondary to service-connected cervical spine disability are not met. 38 U.S.C. §§ 1110, 1131, 5107; 38 C.F.R. §§ 3.102, 3.303, 3.310.

6. The criteria for service connection for neuropathy, right upper extremity secondary to service-connected cervical spine disability are not met. 38 U.S.C. §§ 1110, 1131, 5107; 38 C.F.R. §§ 3.102, 3.303, 3.310.

7. The criteria for service connection for neuropathy, left lower extremity secondary to service-connected lumbar spine disability are not met. 38 U.S.C. §§ 1110, 1131, 5107; 38 C.F.R. §§ 3.102, 3.303, 3.310.

8. The criteria for service connection for neuropathy, right lower extremity secondary to service-connected lumbar spine disability are not met. 38 U.S.C. §§ 1110, 1131, 5107; 38 C.F.R. §§ 3.102, 3.303, 3.310.

9. The criteria for a disability rating in excess of 20 percent for the service-connected lumbar spine disability have not been met. 38 U.S.C. § 1155, 5103, 5103A, 5107; 38 C.F.R. §§ 4.1, 4.3, 4.7, 4.71a, Diagnostic Code (DC) 5242.

10. The criteria for a disability rating in excess of 20 percent for the service-connected cervical spine disability have not been met. 38 U.S.C. § 1155, 5103, 5103A, 5107; 38 C.F.R. §§ 4.1, 4.3, 4.7, 4.71a, DC 5242.

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Veteran served on active duty with the United States Air Force from November 1966 to February 1967, February 1967 to July 1973, and July 1976 to June 1979. 

These matters come before the Board of Veterans' Appeals (Board) from a November 2017 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO). In March 2018, the Veteran filed a notice of disagreement for the claims decided herein and in April 2020, a Statement of the Case (SOC) was issued.

In February 2021, the Veteran testified in a virtual tele-hearing. A transcript of the hearing is of record.

In the May 2020 VA Form 10182, Decision Review Request: Board Appeal, the Veteran elected the Hearing docket. Therefore, the Board may only consider the evidence of record at the time of the May 2020 SOC, as well as any evidence submitted by the Veteran or his attorney at the hearing or within 90 days following the hearing. 38 C.F.R. § 20.302(a). In February 2021, the Veteran testified before a Veterans Law Judge; a transcript of the hearing is of record.

New and Material

Generally, a claim that has been denied in an unappealed RO decision may not thereafter be reopened and allowed. 38 U.S.C. § 7105(c). The exception to this rule is 38 U.S.C. § 5108, which provides that if new and material evidence is presented or secured with respect to a claim that has been disallowed, the Secretary shall reopen the claim and review the former disposition of the claim.

New evidence is defined as existing evidence not previously submitted to agency decision makers. Material evidence means evidence that, by itself or when considered with previous evidence of record, relates to an unestablished fact necessary to substantiate the claim. New and material evidence can be neither cumulative nor redundant of the evidence previously of record and must raise a reasonable possibility of substantiating the claim. 38 C.F.R. § 3.156(a). There is a low threshold for determining whether evidence raises a reasonable possibility of substantiating a claim. Shade v. Shinseki, 24 Vet. App. 110, 117 (2010).

For the purpose of establishing whether new and material evidence has been submitted, the credibility of the evidence is presumed unless the evidence is inherently incredible or consists of statements that are beyond the competence of the person or persons making them. See Justus v. Principi, 3 Vet. App. 510, 513 (1992).

1. The application to reopen the previously denied claim for entitlement to service connection for tinnitus and bilateral hearing loss 

The Veteran's claims for entitlement to service connection for tinnitus and bilateral hearing loss was denied in a September 1979 rating decision. The pertinent evidence then of record includes service treatment records, a VA examination report, and the Veteran's application for compensation. Service connection was denied on the basis that the Veteran's defective hearing was held to have existed prior to service with no aggravation beyond normal progression being so during active military service. The RO also found that service treatment records also indicate that the Veteran's tinnitus existed prior to service. 

Although notified of the September 1979 denial in an October 1979 disability award letter, the Veteran did not appeal that decision, nor did he submit new and material evidence within the remaining appeal period. Accordingly, the September 1979 denial is final as to the evidence then of record, and it is not subject to revision on the same factual basis. See 38 U.S.C. § 7105(c); Bond v. Shinseki, 659 F.3d 1362 (Fed. Cir. 2011); 38 C.F.R. §§ 3.104, 3.156(a)-(b), 20.302, 20.1103.

Pertinent evidence added to the claims file since the September 1979 rating decision includes additional medical treatment records, a private positive nexus opinion, statements, and a February 2021 Board hearing transcript indicating that the Veteran's tinnitus and bilateral hearing loss may be aggravated from his active military service. This evidence provides bases for reopening the claim for service connection. The evidence was not before the agency of decision makers at the time of the September 1979 final denial of the claims for service connection, and, it is not duplicative or cumulative of evidence previously of record. Moreover, the new evidence submitted is material in that it relates to the basis for the prior denial, i.e., the lack of evidence establishing aggravation.

Thus, the evidence submitted relates to unestablished facts necessary to substantiate the claims for service connection and also raise a reasonable possibility of substantiating the claims. See Shade, 24 Vet. App. at 110. The criteria for reopening the claims for service connection for tinnitus and bilateral hearing loss have therefore been met.

Service Connection

Service connection will be granted if the evidence demonstrates that current disability resulted from an injury suffered or disease contracted in active military, naval, or air service. 38 U.S.C. §§ 1110, 1131; 38 C.F.R. § 3.303(a). Establishing service connection generally requires competent evidence of three things: (1) current disability; (2) in-service injury or disease; and (3) a relationship between the two. Saunders v. Wilkie, 886 F.3d 1356, 1361 (Fed. Cir. 2018). Consistent with this framework, service connection is warranted for a disease first diagnosed after service when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d).

Pursuant to 38 C.F.R. § 3.303(b), where a chronic disease is shown as such in service, subsequent manifestations of the same chronic disease are generally service connected; if a chronic disease is noted in service but chronicity in service is not adequately supported, a showing of continuity of symptomatology after separation is required. Entitlement to service connection based on chronicity or continuity of symptomatology pursuant to 38 C.F.R. § 3.303(b) applies only when the disability for which the Veteran is claiming compensation is due to a disease enumerated on the list of chronic diseases in 38 U.S.C. § 1101(3) or 38 C.F.R. § 3.309(a). Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013). In addition, such chronic diseases are presumed to have been incurred in service if they manifested to a compensable degree within one year of separation from service. 38 U.S.C. §§ 1101(3), 1112(a)(1), 1113; 38 C.F.R. §§ 3.307(a), 3.309(a).

In all cases, a Veteran is presumed to have been sound upon entry into active service, except as to defects, infirmities, or disorders noted at the time of the acceptance, examination, or enrollment, or where clear and unmistakable evidence demonstrates that the condition existed before acceptance and enrollment and was not aggravated by such service. 38 U.S.C. § 1111; 38 C.F.R. § 3.304(b). In other words, "[w]hen no preexisting condition is noted upon entry into service, the veteran is presumed to have been sound upon entry." Wagner v. Principi, 370 F.3d 1089, 1096 (Fed. Cir. 2004).

When the record of an entrance examination has been lost or destroyed while in government custody, the presumption of sound condition applies. Quirin v. Shinseki, 22 Vet. App. 390, 396, n.5 (2009).

2. Entitlement to service connection for tinnitus and bilateral hearing loss

For the purpose of applying the laws administered by VA, impaired hearing is considered a disability when the auditory threshold in any of the frequencies 500, 1,000, 2,000, 3,000, or 4,000 Hertz is 40 decibels or greater; or when the auditory threshold for at least three of the frequencies 500, 1,000, 2,000, 3,000, or 4,000 Hertz is 26 decibels or greater; or when speech recognition scores using the Maryland CNC Test are less than 94 percent. 38 C.F.R. § 3.385. When audiometric test results at separation from service do not meet the regulatory requirements for establishing a "disability" at that time, a veteran may nevertheless establish service connection for a current hearing disability by submitting evidence that the current disability is causally related to service. Hensley v. Brown, 5 Vet. App. 155, 160 (1993). The threshold for normal hearing is from 0 to 20 decibels. Id. at 157.

The Veteran contends that his diagnosed tinnitus and bilateral hearing loss is due to his active military service. Specifically, he argues that his time on the firing range during service led to his tinnitus and bilateral hearing loss. Notably, as it relates to the service treatment records, audiological reports were routinely converted from ISO-ANSI results to ASA units until the end of 1975 because the regulatory standard for evaluating hearing loss was not changed to require ISO-ANSI units until September 9, 1975. It is not clear from all the audiograms noted in his STRs whether the reports were in ISO-ANSI or ASA units.

Service treatment records (STRs) reflect that a July 1966 report of medical history for officer training school [the coinciding report of medical examination is illegible] does not reflect complaint of hearing loss. A March 1968 periodic report of medical examination reflects hearing loss, no complications no sequelae since 1968. The clinician noted high frequency hearing loss noted in the summary of defects and diagnosis. In February 1969, the Veteran was seen, in part, for complaint of loss of hearing and was diagnosed with a cold. In January 1971 a clinician noted that the Veteran had bilateral high frequency hearing loss and needed an evaluation. The February 1971 report of hearing evaluation revealed that the Veteran had high frequency neurosensory hearing loss. It was noted that the Veteran had trauma at age 12. The clinician also noted "symptomatic of bilateral tinnitus" and that the Veteran was to have a reevaluation one year later. In April 1972, the Veteran complained of a cold and having hearing trouble. The clinician noted that he had high frequency hearing loss. He was referred to an ear, nose, throat (ENT) specialist and the reason for a request was noted as progressive (post traumatic) high frequency hearing loss and tinnitus. The April 1972 ENT consultation report stated that five years ago, the Veteran started having tinnitus post firing gun. There was no vertigo, no unsteadiness, and no headaches. The clinician noted that the audiogram revealed bilateral high frequency loss with discrimination. The June 1973 separation report of medical examination revealed hearing loss, first noted upon entry, probably due to gunfire at Lackland. In the summary of defects and diagnosis, high frequency loss was noted, and it was recommended that the Veteran follow up with the VA for hearing loss. The Veteran's coinciding report of medical history reflects that he noted hearing loss.

An August 1975 extended active duty report of medical examination does not reflect that the examiner noted bilateral hearing loss; however, the audiogram appears to reflect bilateral hearing loss in the higher frequencies.

In a January 1978 report of medical history, the Veteran noted hearing loss. The coinciding January 1978 report of medical examination reflects high frequency hearing loss, bilaterally that was stable, and did not interfere with performance of duties. The clinician noted that the hearing loss, high frequency with tinnitus, was first documented on entry into active duty in 1968. He reported that ENT evaluations in February 1971 and May 1972 and current audiogram showed no significant changes. He noted "sensory neural in nature, stable." A September 1978 treatment note reflects that the Veteran reported that he had trouble with his right ear. He reported momentary tinnitus from an air hose rupture three inches from his right ear. There were no extensive signs of trauma. A December 1978 report of medical examination reflects that the Veteran had high frequency hearing loss, bilaterally. The clinician noted that it was stable, does not interfere with performance of duties.

Post-service, an August 1979 audiology examination report reflects that the Veteran reported that he could not understand conversation with any background noise. He reported defective hearing which relates to being on the firing range when he was in service. He did not admit to any pre-service trouble with his ears. The clinician noted that the Veteran seems to hear well with ordinary conversation.

The September 1979 VA medical opinion reflects that the Veteran's service entrance examination for his first period of service is not available. The clinician noted that STRs show that high frequency hearing loss with tinnitus was first documented on entry into active duty in 1968. Audiometric examination conducted in 1971 confirmed high frequency hearing loss in both ears as secondary to noise trauma at age 12. The Veteran was seen in April 1972 and indicated that he started having tinnitus five years ago after firing a gun. He was next seen in September 1978 with complaints of having a momentary tinnitus from an air hose rupture. The examination of the ears showed no external signs of trauma. The Veteran was to be re-examined if the symptoms persisted but the STRs are negative for any re-examination. On VA audiometric examination, physical examination of both ears was negative. The Veteran made no complaints of tinnitus. Audiometric examination confirmed the diagnosis of high frequency hearing loss in the 4,000-cycle range. Speech reception examination showed speech reception threshold of the right ear as 8db and for the left ear 14db. Discrimination ability was 88 percent for both ears. In his application for compensation benefits, he indicated tinnitus in April 1972 only. The clinician opined that the Veteran's defective hearing is held to have existed prior to service with no aggravation beyond normal progression being so during active military service. He reported that STRs also indicate that the Veteran's tinnitus existed prior to service. Although the Veteran did complain of tinnitus in 1972, and in 1978, there is no evidence of the tinnitus being persistent especially in view of the Veteran not complaining of tinnitus on current examination.

A November 2017 VA examination report reflects that audiometric testing revealed the following pure tone threshold in decibels:

Hertz

 500 Hz 1000 Hz 2000 Hz 3000 Hz 4000 Hz

Right 20 25 60 75 80

Left 20 25 70 80 95

His speech recognition scores were 88 percent for the right ear and 92 percent for the left ear. The Veteran was diagnosed with bilateral sensorineural hearing loss. Additionally, the Veteran reported tinnitus. The audiologist noted that the Veteran was not forthcoming about his pre-existing history of noise exposure and tinnitus. The audiologist reported that the claimed conditions/symptoms of hearing loss and tinnitus were less likely as not (less than 50/50 probability) caused by or a result of noise exposure in the military for both ears. As rationale, he reported that there is insufficient evidence from longitudinal studies in laboratory animals or humans to determine whether permanent noise-induced hearing loss can develop much later in one's lifetime, long after the cessation of that noise exposure. Although the definitive studies to address this issue have not been performed, based on the anatomical and physiological data available on the recovery process following noise exposure, it is unlikely that such delayed effects occur. In the absence of an objectively verifiable noise injury, the association between claimed tinnitus and noise exposure cannot be assumed to exist. Tinnitus may occur following a single exposure to high-intensity impulse noise, long-term exposure to repetitive impulses, long-term exposure to continuous noise, or exposure to combination of impulses and continuous noise. However, you would have to accept the scientifically unsubstantiated theory that tinnitus occurred as a result of some latent, undiagnosed noise injury. He reported that IOM never stated that tinnitus could result from undiagnosed noise injuries. In most cases, tinnitus is accompanied by measurable hearing loss. He reported that he recognized that the audiogram is an imperfect measurement. Nevertheless, he concluded that it is accepted as the objective basis for determining nose injuries.

The audiologist reported that STRs show that high frequency hearing loss with tinnitus was first documented on entry into active duty in 1968. Audiometric examination conducted in 1971 confirmed high frequency hearing loss in both ears as secondary to noise trauma at age 12. The Veteran was seen in April 1972 and indicated that he started having tinnitus five years ago after firing a gun and he was next seen in September 1978 with complaints of having a momentary tinnitus front on air hose rupture. Examination of the ears showed no external signs of trauma. On VA audiometric examination, both ears were negative, and the Veteran did not make any complaints of tinnitus. A comparison of May 15, 1979 separation audio evaluation to the enlistment audio [the examiner used the March 1968 audiogram] indicates that there was not a significant threshold shift (greater than 10 dbHL) at 4 khz bilaterally and no significant threshold shifted noted bilaterally. Although a significant threshold shift was noted at 4kHz, the Veteran had limited noise exposure and in the audiologist's opinion, it is not evidence of aggravation of the pre-existing hearing loss that was permanently increased beyond the natural progression in military service for. There was no evidence of aggravation of pre-existing hearing loss that was permanently increased beyond the natural progression in military service bilaterally.

During the February 2021 Board hearing, the Veteran testified that he received officer training school where they had to fire firearms and pistols. He testified that even though they wore some hearing protection, the firearm backfired, and he had tremendous ringing and explosion in his ear. He testified that he has had ringing in his ears since then. He reported that he has not had any post-service noise exposure. He testified that he began having difficulty understanding people within a year or two of the noise exposures in the military (1969 and 1970). He reported that his condition had progressively worsened since then.

An April 2021 report from a private audiologist, Dr. D.M., reflects that she reported that she reviewed the in-service records and post service medical records. She reported that the Veteran served in the United States Army from 1968 to 1979. The Veteran reported that he had high speed drill noise exposure about six hours a day. Additionally, he reported that he had pistol training for two months where a gun backfired resulting in tinnitus in both of his ears. The Veteran reported that he did not use hearing protection while in basic training. He reported an onset of bilateral tinnitus in 1968. She found that the Veteran had bilateral sensorineural hearing loss and that word recognition was very poor in the right ear and good in the left ear. She concluded that after reviewing the Veteran's medical history, in her professional opinion, his hearing loss and tinnitus symptoms are more likely than not (more than 50 percent certainty) due to noise exposure he experienced while serving in the armed forces. 

In an April 2021 audiology report from the same clinic, but a different audiologist Dr. C.R., she found that the Veteran has a diagnosis of tinnitus and explained that since the Veteran does not have allergy or cervical spine problems, it is very likely the tinnitus is a result of sensorineural hearing loss. She opined that based on her examination of the Veteran and review of his records it is more likely than not caused by (more than 50 percent) the acoustic trauma that occurred in-service. As rationale, she reported that while the Veteran has other noise exposure history, he was also exposed to a significant amount of noise in the military where he reports his tinnitus began.

Additionally, she opined that in her professional medical opinion, the Veteran has bilateral hearing loss that is more likely than not caused by (more than 50 percent certainty) the acoustic trauma that occurred in-service. As rationale, she reported that hearing loss due to noise exposure typically does not reveal itself until after years of noise exposure. She reported that although he had noise exposure after the military his exposure while in service did contribute to the severity of the hearing loss. She noted that speech discrimination scores in the left ear was 72 percent and 32 percent for the right ear.

Finally, in May 2021, the Veteran's wife submitted a buddy statement where she reported that she knew the Veteran prior to his service. She reported that she first noticed that the Veteran had bilateral hearing loss and tinnitus after rifle training.

A Veteran is presumed to have been sound upon entry into active service, except as to defects, infirmities, or disorders noted at the time of the acceptance, examination, or enrollment, or where clear and unmistakable evidence demonstrates that the condition existed before acceptance and enrollment and was not aggravated by such service. 38 U.S.C. § 1111; 38 C.F.R. § § 3.304(b). In other words, "[w]hen no preexisting condition is noted upon entry into service, the veteran is presumed to have been sound upon entry." Wagner v. Principi, 370 F.3d 1089, 1096 (Fed. Cir. 2004). Here, the Veteran's entrance examination is missing and in October 2017, the VA was informed that all available requested records were shipped. Thus, the Veteran is presumed sound upon entry. See Quirin v. Shinseki, 22 Vet. App. 390, 396, n.5 (2009). However, the majority of the STRS reflect that the Veteran had childhood bilateral hearing loss and tinnitus at the age of 12, and his September 1979 and November 2017 VA examination reports indicates that his bilateral hearing loss and tinnitus pre-existed his active military service. Specifically, in February 1971, April 1972, June 1973, and January 1978, the clinicians all noted bilateral hearing loss from his childhood. Notably, the June 1973 and January 1978 report of medical examinations specifically noted that the Veteran's bilateral hearing loss was noted on entry. Additionally, the VA clinicians both found that the Veteran's bilateral hearing loss and tinnitus was not aggravated by service. The September 1979 and November 2017 clinicians provided a thorough rationale to support their opinions regarding the nature of the Veteran's bilateral hearing loss and tinnitus, thus their opinion are afforded significant probative weight. See Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 304 (2008) (most of the probative value of a medical opinion comes from its reasoning). Thus, there is clear and unmistakable evidence that the Veteran's bilateral hearing loss and tinnitus pre-existed service and clear and unmistakable evidence that it was not aggravated by service; therefore, the presumption of soundness has been rebutted.

Considering the evidence of record under the laws and regulations as set forth above, the Board concludes that service connection for bilateral hearing loss and tinnitus is not warranted. The September 1979 and November 2017 VA medical opinions indicate that the Veteran's tinnitus and bilateral hearing loss were less likely than not (less than a 50 percent probability) related to aggravation of the preexisting disorder by service. The clinicians opined that the Veteran's tinnitus and bilateral hearing loss were less likely than not (less than a 50 percent probability) related to service, or aggravated beyond its natural progression by service, and provided a thorough rational based on an accurate characterization of the evidence. The November 2017 VA clinician specifically discussed the history of the Veteran's tinnitus and bilateral hearing loss and addressed the threshold shifts in service and his current disability. Therefore, the opinions are afforded significant probative value as to the etiology of the Veteran's tinnitus and bilateral hearing loss. See Nieves-Rodriguez, 22 Vet. App. at 304.

In contrast to the above opinions, the April 2021 private opinions do not appear to have done a thorough review of the claims file before providing their opinions. Notably, Dr. D.M. noted incorrect dates of service, as well as the branch of service, for the Veteran. Both Dr. D.M. and Dr. C.R. based their rationales, in part, on the belief that the Veteran had no cervical spine problems, and thus, his tinnitus is a result of his sensorineural hearing loss. A review of the claims file reveal that the Veteran is service connected for a cervical spine disability. Additionally, Dr. D.M. and Dr. C.R. did not address whether the Veteran had pre-existing tinnitus and bilateral hearing loss and whether these disabilities could have been aggravated beyond the natural progression by his active military service. To the extent that an opinion is based on the service history provided by the Veteran, such reliance only warrants the discounting of a medical opinion in certain circumstances, such as when the opinions are contradicted by other evidence in the record or when the Board rejects the statements of the veteran. See Coburn v. Nicholson, 19 Vet. App. 427, 432-433 (2006); Kowalski v. Nicholson, 19 Vet. App. 171, 179 (2006). Dr. D.M. and Dr. C.R.'s opinions are contradicted by the claims file. Additionally, the Veteran has made contradictory statements regarding his tinnitus and bilateral hearing loss. During the VA examinations, the Veteran was not forthcoming about his childhood noise exposure and subsequent tinnitus and bilateral hearing loss. During the February 2021 Board testimony, he reported that they wore hearing protection at times in service. However, during the April 2021 private audiology examination, he reported that they did not wear hearing protection. Thus, the Board finds the VA opinions to be more probative than the April 2021 private opinions.

For the above stated reasons, the evidence clearly and unmistakably shows both that tinnitus and bilateral hearing loss preexisted service and was not aggravated thereby. This same evidence shows that the preexisting tinnitus and bilateral hearing loss was not aggravated by service. The claim for service connection for tinnitus and bilateral hearing loss must be denied. The Board is sympathetic to the Veteran and recognizes his distinguished service but is bound by the applicable laws and regulations. 38 U.S.C. § 7104 (c) (2012); 38 C.F.R. § 20.105 (2020).

3. Entitlement to service connection for bilateral neuropathy of the lower and upper extremities 

The Veteran contends that his bilateral neuropathy of the lower and upper extremities are due to his service-connected lumbar and cervical spine disabilities.

Service connection for a claimed disability may be established on a secondary basis for a disability that is proximately due to or the result of a service-connected disease or injury. 38 C.F.R. § 3.310 (a). Establishing service-connection on a secondary basis requires evidence sufficient to show (1) that a current disability exists and (2) that the current disability was either (a) caused by or (b) aggravated by a service-connected disability. 38 C.F.R. § 3.310 (a).

VA treatment records from April 2012 reflect an electrocardiogram report that was noted as abnormal. The impression was severe, length dependent sensorimotor peripheral neuropathy with axonal features. He was referred to neurology. In October 2016, a neurologist noted that extensive work up is unrevealing except for diabetes mellitus as the cause for his polyneuropathy. A February 2017 report showed that a recent EMG study revealed severe length-dependent neuropathy of the axonal type. There was no demyelination. The neurologist noted that the lab work has been negative, except borderline diabetes markers. In March 2017, the Veteran was seen in the neurology clinic. The clinician noted that the Veteran has diabetic neuropathy based on testing, lumbar puncture results, and EMG findings. He presented with paresthesia in feet and shins. He reported some numbness ulnar distribution in his hands and recently was unable to stand on his heels as his lower legs were weak. 

A March 2020 VA examination report reflects that the Veteran reported symptoms of paresthesias starting around 2014 to 2015. The examiner noted that nerve conduction studies showed axonal degeneration consistent with diabetic peripheral neuropathy. It did not show demyelination that would be consistent with other types of neuropathy. He noted that Dr. C. reported that the Veteran likely has diabetic peripheral neuropathy which can present before the onset of diabetes. The examiner noted that the Veteran has a diagnosis of diabetic peripheral neuropathy, bilateral upper and lower extremities. The examiner reported that the etiology for the bilateral upper and lower neuropathy is diabetes mellitus type II. He reported that nerve conduction studies show axonal degeneration not demyelination, which is consistent with diabetic peripheral neuropathy. He stated that symptoms of diabetic peripheral neuropathy can appear before the diagnosis of diabetes is made. He noted that both Dr. C and Dr. G (VA neurologist) opine that the peripheral neuropathy is due to diabetes mellitus. He concluded that there is no other plausible etiology of peripheral neuropathy besides diabetes mellitus.

During the February 2021 Board hearing, the Veteran testified that he had pain, tingling, and numbness that radiates from the neck. He testified that he experienced these symptoms for a "good while" and the severity has increased. The Veteran argued that he only went into the diabetic range one time for a short time and now he is classified as prediabetic. He reported that he began to experience the radiating pain in his extremities before he was diagnosed with diabetes.

Upon review of the evidence of record, service connection for bilateral neuropathy of the upper and lower extremities is not warranted.

Based on a review of the available records, and his particular expertise, the March 2020 VA examiner found that the etiology of the Veteran's bilateral neuropathy of the upper and lower extremities is diabetes mellitus. The Veteran's diabetes mellitus is not service connected. As the physician explained the reasons for his conclusions based on an accurate characterization of the evidence of record, the opinion is entitled to substantial probative weight. See Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 304 (2008) (most of the probative value of a medical opinion comes from its reasoning). There is competent and probative medical evidence with substantial and adequate rationale explaining that the Veteran's bilateral neuropathies are due to his diabetes mellitus and are not related to his service-connected cervical or lumbar disabilities.

To the extent that the Veteran, including through his attorney, has opined that his bilateral neuropathy of the upper and lower extremities is related to his service-connected lumbar disabilities, lay witnesses are competent to opine as to some matters of diagnosis and etiology, and the Board must determine on a case by case basis whether a veteran's particular disability is the type of disability for which lay evidence is competent. See Davidson v. Shinseki, 581 F.3d 1313, 1316 (Fed. Cir. 2009). In this case, the Veteran's contentions as to the etiology of his neuropathies relate to an internal medical process which extends beyond an immediately observable cause-and-effect relationship that is of the type that the courts have found to be beyond the competence of lay witnesses. Compare Jandreau v. Nicholson, 492 F.3d 1372, 1376 (Fed. Cir. 2007) (witness capable of diagnosing varicose veins, for example). The Veteran's statements are therefore not competent in this regard. To the extent that these lay statements are credible, the Board finds the specific, reasoned opinion of the VA examiner to be of greater probative weight than the Veteran's more general lay assertions.

For the foregoing reasons, the preponderance of the evidence is against the claim for bilateral neuropathy of the upper and lower extremities. The benefit of the doubt doctrine is therefore not for application and the claim must be denied. 38 U.S.C. § 5107(b); 38 C.F.R. § 3.102.

Increased Rating

Disability evaluations are determined by the application of VA's Schedule for Rating Disabilities, which is based on average impairment of earning capacity. 38 U.S.C. § 1155; 38 C.F.R. Part 4. Where there is a question as to which of two evaluations shall be applied, the higher rating will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7. After careful consideration of the evidence, any reasonable doubt remaining is resolved in favor of the veteran. 38 C.F.R. § 4.3.

4. Entitlement to an increased disability rating for lumbar spine

The Veteran contends that the symptoms of his lumbar spine disability warrant an increased disability rating. The Veteran is in receipt of a 20 percent rating for degenerative arthritis of the spine, multilevel degenerative narrowing of the neural foramina and spondylolisthesis of L5 on S1 under 38 C.F.R. § 4.71a, DC 5242.

Disabilities rated under DC 5235 to 5242 are rated under the General Rating Formula for Rating Diseases and Injuries of the Spine (General Rating Formula).

Spine disabilities are rated under either the General Rating Formula for Diseases and Injuries of the Spine or the Formula for Rating Intervertebral Disc Syndrome (IVDS) based on Incapacitating Episodes, under Diagnostic Code 5243, whichever would result in a higher rating. 38 C.F.R. § 4.71a.

Degenerative or traumatic arthritis established by X-ray findings will be rated on the basis of limitation of motion under the appropriate diagnostic codes for the specific joints or joint involved; in this case Diagnostic Code 5237. 38 C.F.R. § 4.71a, Diagnostic Codes 5003 and 5010. If a compensable degree of limitation of motion is not shown under the relevant rating criteria for the joint involved (Diagnostic Code 5237), then Diagnostic Code 5003 provides for a 10 percent rating for each such major joint or group of minor joints affected by limitation of motion.

The General Rating Formula for Diseases and Injuries of the Spine, with or without symptoms such as pain (whether or not it radiates), stiffness, or aching in the area of the spine affected by residuals of injury or disease, provides the following:

A 10 percent rating is assigned when forward flexion of the thoracolumbar spine is greater than 60 degrees but not greater than 85 degrees; or, combined range of motion of the thoracolumbar spine is greater than 120 degrees but not greater than 235 degrees; or, muscle spasm, guarding, or localized tenderness not resulting in abnormal gait or abnormal spinal contour; or, vertebral body fracture with loss of 50 percent or more of the height. 

A 20 percent rating is assigned when forward flexion of the thoracolumbar spine is greater than 30 degrees but not greater than 60 degrees; or combined range of motion of the thoracolumbar spine is not greater than 120 degrees; or, muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis. 

A 40 percent rating is assigned when forward flexion of the thoracolumbar spine is 30 degrees or less; or there is favorable ankylosis of the entire thoracolumbar spine. 

A 50 percent rating is assigned when there is unfavorable ankylosis of the entire thoracolumbar spine. 

A 100 percent rating is assigned for unfavorable ankylosis of entire spine. 38 C.F.R. § 4.71a.

The current spine rating criteria instructs the Board to evaluate any associated objective neurologic abnormalities, including, but not limited to, bowel or bladder impairment, separately, under an appropriate diagnostic code. See 38 C.F.R. § 4.71a, Note (1).

The current spine rating criteria provides specific values for range of motion of the thoracolumbar (thoracic and lumbar) spine. For the thoracolumbar spine, normal forward flexion is 0 to 90 degrees, extension is 0 to 30 degrees, left and right lateral flexion are 0 to 30 degrees, and left and right lateral rotation are 0 to 30 degrees. See 38 C.F.R. § 4.71a, Note (2) (see also Plate V).:

When rating musculoskeletal disabilities, VA must consider granting a higher rating in cases in which the Veteran experiences functional loss due to limited or excess movement, pain, weakness, excess fatigability, or incoordination (to include during flare-ups or with repeated use), and those factors are not contemplated in the relevant rating criteria. 38 C.F.R. §§ 4.40, 4.45; DeLuca v. Brown, 8 Vet. App. 202, 204-7 (1995). The provisions of 38 C.F.R. § 4.40 and 38 C.F.R. § 4.45 are to be considered in conjunction with the diagnostic codes predicated on limitation of motion. Johnson v. Brown, 9 Vet. App. 7 (1996).

For VA purposes, unfavorable ankylosis is a condition in which the entire thoracolumbar spine, or the entire spine is fixed in flexion or extension, and the ankylosis results in one or more of the following: difficulty walking because of a limited line of vision; restricted opening of the mouth and chewing; breathing limited to diaphragmatic respiration; gastrointestinal symptoms due to pressure of the costal margin on the abdomen; dyspnea or dysphagia; atlantoaxial or cervical subluxation or dislocation; or neurologic symptoms due to nerve root stretching. 38 C.F.R. § 4.71a, Diagnostic Code 5242, Note (5).

During the pendency of the Veteran's increased rating claim on appeal, the rating criteria for evaluating arthritis and certain musculoskeletal disabilities were amended, effective on February 7, 2021. The change added certain diagnostic codes and amended the rating criteria for several diagnostic codes listed under 38 C.F.R. § 4.71a.

With respect to the lumbar spine, the revised criteria instruct to assign Diagnostic Code 5243 for IVDS only when there is disc herniation with compression and/or irritation of the adjacent nerve root; and, to assign Diagnostic Code 5242 for all other disc diagnoses. The Veteran has not been diagnosed with IVDS.

Turning to the evidence of record, a November 2017 VA examination report reflects that the Veteran has a diagnosis of multilevel degenerative narrowing of the neural foramina and spondylolisthesis at L5-S1. He described pain as 6 to 7 out of 10 almost constantly. He reported that the pain becomes too intense if he sits for long periods of time. He reported that he takes Ibuprofen for the back pain. He reported that he did daily stretching and used ice for his back. He reported that he was diagnosed with polyneuropathies. He reported that he began noticing burning, tingling, numbness in his feet and it was slowly move up his legs to the mild calf over the last six months. He reported flare-ups described as pain becomes too intense if he sits for a long period of time. He reported functional loss/impairment described as less motion, more pain. Initial range of motion (ROM) testing revealed forward flexion to 55 degrees and extension to 10 degrees. Range of motion itself contributed to functional loss described as decreased ROM. Pain was noted on examination and caused functional loss. Range of motion exhibited pain on flexion and extension. There was evidence of pain with weight bearing. There was no objective evidence of localized tenderness or pain on palpation of the joints or associated soft tissue of the spine. The Veteran was able to perform repetitive use testing with at least three repetitions with no additional loss of function or ROM. The examiner was unable to say without mere speculation whether pain, weakness, fatigability, or incoordination significantly limit functional ability with repeated use over time. He reported that any decrease in ROM with repeated use over time is merely speculative and highly subjective (on the Veteran's word alone) as neither he or any other medical provider is present to objectively and repetitively measure (with a goniometer) the change in ROM with repeated use over time. The Veteran denied objectively and repetitively measuring (with a goniometer) ROM with repeated use over time. The examiner was unable to say without mere speculation whether pain, weakness, fatigability, or incoordination significantly limit functional ability with flare ups and provided the same rationale. The Veteran did not have a diagnosis of guarding and muscle spasm. He did not have muscle atrophy. His sensory examination showed that sensation to light touch was decreased in the bilateral lower extremities. The Veteran did not have radicular pain or any other signs or symptoms due to radiculopathy. There was no ankylosis. The examiner noted that a November 2016 nerve conduction studies revealed evidence of length dependent axonal sensory-motor neuropathy unrevealing except for diabetes mellitus type II as a possible cause. The Veteran did not have IVDS. He did not use any assistive devices. The examiner reported that ROM testing were conducted in weight bearing position. He stated that non weight bearing is impractical.

A March 2020 VA examination report reflects that the Veteran has a diagnosis of degenerative narrowing of neuro foramina and spondylolisthesis of the L5-S1. He reported that his lumbar spine disability has become worse over the years. His current symptoms were described as lower back pain, difficulty bending over due to pain, and pain straightening his spine after bending over. He reported that he rarely had radiation of pain down his legs. He reported pain radiates to his feet. He reported flare-ups described as pain with moving forward or side to side. He stated that sitting for long periods of time is painful. The Veteran reported functional loss/impairment described as interference with his dental work which causes difficulty bending forward. Initial ROM testing revealed flexion to 75 degrees and extension to 20 degrees. ROM itself contributed to a functional loss described as difficulty bending forward. Pain was noted on forward flexion and extension that causes functional loss. There was objective evidence of localized tenderness or pain on palpation of the joint. There was no evidence of pain with weight bearing. The Veteran was able to perform repetitive-use testing with at least three repetitions with no additional loss of function or ROM after repetitions. Pain caused functional loss and the examiner was unable to describe this in terms of ROM because there was no expected further loss of ROM. Pain caused functional loss with flare-ups and the examiner was unable to describe this in terms of ROM because there is no further loss of ROM expected. The Veteran did not have guarding or muscle spasm and atrophy. His sensation to light touch was decreased in his lower leg/ankle and foot/toes. He did not have radicular pain or any other signs or symptoms due to radiculopathy. There was no ankylosis of the spine. There was no IVDS. He did not use any assistive devices. There is no objective evidence of pain when the back is used in non-weight bearing. Passive ROM was the same as active ROM.

During the February 2021 Board hearing, the Veteran testified that he did not have full range of motion in his back. He reported that he could bend to 90 degrees. He testified that he has flare-ups. He reported that the pain in his back does not radiate into his legs. He reported that he does not have sciatic pain that goes down to his buttocks. 

A May 2021 private examination report from Dr. M.S. reflects that on examination, the Veteran had a combined ROM of the thoracolumbar spine greater than 120 degrees but not greater than 235 degrees; forward flexion of the thoracolumbar spine 30 degrees or less; unfavorable ankylosis of the entire thoracolumbar spine. The Veteran has limited capacity to move his upper and mid back arms and torso. He has pain in all these areas. She reported that forward flexion and backward extension are very limited. She stated that pain is elicited with minimal angulation. The spine described is also inflexible for most twisting/turning movements. Range of motion testing of the thoracolumbar spine revealed forward flexion to 25 degrees, with pain beginning at 25 degrees. Extension was greater than 20 degrees with pain beginning at 20 degrees. On active motion, he had moderate to severe pain and limitation of movement. On passive motion, he had moderate pain rated as a 6 out of 10. He had a 9 out of 10 pain with weight-bearing and 7 to 8 out of 10 pain without weight-bearing. The Veteran reported that he experienced flare-ups every two to three weeks that lasted five to six hours. Functional impairment was described as the need to decline or sit for any flare. Dr. M.S. noted that his lumbar spine disability impacted his ability to work. She reported that he needs to rest several times a day and needs one hour of back rest. She reported that his lumbar spine disability impacted his activities of daily living. She reported that he cannot enjoy fitness exercises, stand, or drive for any length beyond 30 minutes. Dr. M.S. found that the Veteran has radiculopathy in his right and left lower extremity that radiates from his lumbar spine condition. She opined that it is more likely than not caused by (51 percent certainty or more) his service-related lumbar spine condition. She reported that the constant "leaning over" posture for the focused dental work on patients has contributed significantly to the stress on the entire spine and lumbosacral spine in particular, does sustain most of the wear/tear process. The nerve ducts in the lumbar spine have been impressed at or below the level of the spinal segment. The piriformis muscle can also compress the sciatic nerve to cause buttock pain. Deep tendon reflexes are absent. She reported that the Veteran has weakness of the right lower extremity and partial foot drop. She reported that the nerves impacted on the right and left lower extremity are sciatic, common peroneal, and obturator nerves.

Upon review of the evidence of record, an increased disability rating in excess of 20 percent for the Veteran's lumbar spine disability is not warranted.

Initially, the Board finds that the May 2021 private examination report from Dr. M.S. is inconsistent with the evidence of record. Therefore, it is inadequate for adjudicating the claim. 

The November 2017 and May 2020 VA medical examination reports indicate that the Veteran had marked improvement of forward flexion consistent with the VA treatment records and his February 2021 testimony. Notably, during the Board hearing, the Veteran reported that he could bend up to approximately 90 degrees with pain. This was just three months before his May 2021 private VA examination which marked that the Veteran had unfavorable ankylosis and forward flexion to 25 degrees. There was no indication from the Veteran during the Board hearing or VA treatment records that he experienced ankylosis or symptoms like limited line of vision, restricted opening of the mouth and chewing, or breathing limited to diaphragmatic respiration to indicate that he would have ankylosis whether favorable or unfavorable. During the February 2021 Board hearing, the Veteran testified that he was still working in his capacity as a dentist and still utilizing tools, albeit with pain, to continue to work. Dr. M.S. explained that she found unfavorable ankylosis due to limited capacity to move and inflexibility for most twisting and turning movements. This does not equate to the inability to move or being fixed in a certain position. Furthermore, the November 2017 and May 2020 VA examinations reports specifically note that ROM testing was completed with the use of a goniometer. The May 2021 report from Dr. M.S. does not indicate how the ROM testing was conducted. Additionally, she did not indicate that she reviewed the claims file prior to her report or any indication as to why the Veteran's forward flexion decreased so drastically in such a short period of time after showing improvement between 2017 and 2020. Therefore, the 2017 and 2020 VA examinations are afforded significant probative value as to the severity of the Veteran's lumbar spine disability. See Nieves-Rodriguez, 22 Vet. App. at 304.

A rating in excess of 20 percent is not warranted at any time during the appeal period. The evidence does not reflect limitation of forward flexion of the thoracolumbar spine more nearly approximating 30 degrees or less, or favorable or unfavorable ankylosis of the entire thoracolumbar spine, which would warrant a rating higher than 20 percent. To the contrary, medical treatment records show that the Veteran had limited range of motion due to pain; however, there was no ankylosis. The Veteran reported flare-ups described as the inability to sit for prolonged periods of time, less motion due to pain, pain with moving forward and twisting, and difficulty bending forward. The Veteran was able to perform repetitive-use testing with no additional loss of ROM or loss of function after three repetitions during his VA examinations. He never required or used assistive devices and continued to work as a dentist.

Neither VA treatment notes nor the VA examination report indicate that there was unfavorable ankylosis of the entire thoracolumbar spine or the entire spine. Rather, these documents contain either specific findings of no ankylosis or findings reflecting that there is no ankylosis. The lay statements similarly do not indicate that there has been ankylosis. As such, limitation of flexion to 30 degrees or less is not more nearly approximated. In addition, the evidence does not reflect that the Veteran has suffered from incapacitating episodes due to IVDS.

Finally, with respect to an evaluation for any associated neurological abnormalities, as discussed above, the Veteran's neuropathies have been associated with diabetes mellitus. While the May 2021 report from Dr. M.S. found radiculopathy in the bilateral lower extremities, the November 2017 and May 2021 VA examiners made specific findings, based on the Veteran's nerve studies and neurological examinations, that the Veteran did not have a diagnosis of radiculopathy. Notably, Dr. M.S. did not reference the nerve conduction testing and neuropathy diagnosis when she reported that the Veteran had a radiculopathy diagnosis. Finally, during the February 2021 Board hearing, just three months before Dr. M.S.'s examination, the Veteran specifically testified that he does not have sciatic pain that goes down to his buttocks. Therefore, a finding of bilateral radiculopathy of the lower extremities would not be accurate. 

As the preponderance of the evidence reflects that the symptoms of the Veteran's lumbar spine disability do not more nearly approximate the criteria for a rating in excess of 20 percent for the entire period on appeal, the benefit of the doubt doctrine is not for application and an increased rating for the service-connected lumbar spine disability is not warranted. 38 U.S.C. § 5107 (b); 38 C.F.R. § 4.3.

5. Entitlement to an increased disability rating for cervical spine

The Veteran contends that the symptoms of his cervical spine disability warrant an increased disability rating. The Veteran has been in receipt of a 20 percent rating for degenerative arthritis of cervical spine under 38 C.F.R. § 4.71a, DC 5242.

As noted, during the pendency of the Veteran's increased rating claim on appeal, the rating criteria for evaluating arthritis and certain musculoskeletal disabilities were amended in November 2020, December 2020, and February 2021. See 85 Fed. Reg. 76,453-76,469 (Nov. 30, 2020); 85 Fed. Reg. 85,523-85,524 (Dec. 29, 2020); 86 Fed. Reg. 8,142-8,144 (Feb. 4, 2021). The change, effective February 7, 2021, added certain diagnostic codes and amended the rating criteria for several diagnostic codes listed under 38 C.F.R. § 4.71a.

The United States Court of Appeals for the Federal Circuit (Federal Circuit) has held that the Board may not apply a current regulation prior to its effective date, unless the regulation specifically provides otherwise. See VAOPGCPREC 7-2003 (Nov. 19, 2003); Kuzma v. Principi, 341 F.3d 1327 (Fed. Cir. 2003) (overruling Karnas v. Derwinski, 1 Vet. App. 307 (1991) to the extent that it conflicts with the precedents of the United States Supreme Court and the Federal Circuit). However, the Board is not precluded from applying prior versions of the applicable regulations to the period on or after the effective date of the new regulation if the prior versions were in effect during the pendency of the appeal. See VAOPGCPREC 3-2000, 65 Fed. Reg. 33,422 (2000); see also DeSousa v. Gober, 10 Vet. App. 461, 467 (1997)." As there is no indication that the above amendments were intended to be applied retroactively, the changes do not apply before the date they became effective. See Kuzma, 341 F.3d at 1329.

For the entire appeal period, the criteria for rating disabilities of the spine are listed under DCs 5235 to 5243. See 38 C.F.R. § 4.71a.

The General Rating Formula for Diseases and Injuries of the Spine, provides that with or without symptom such as pain, stiffness or aching in the area of the spine affected by residuals of injury or disease, the following ratings are assigned:

A 10 percent rating is assigned for forward flexion of the cervical spine greater than 30 degrees, but not greater than 40 degrees; or, combined range of motion of the cervical spine greater than 170 degrees, but not greater than 335 degrees; or, muscle spasm, guarding, or localized tenderness not resulting in abnormal gait or abnormal spinal contour; or vertebral body fracture with loss of 50 percent or more of the height.

A 20 percent rating is assigned for forward flexion of the cervical spine greater than 15 degrees but not greater than 30 degrees; or, the combined range of motion of the cervical spine not greater than 170 degrees; or, muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis. Id.

A 30 percent rating is assigned for forward flexion of the cervical spine 15 degrees or less; or, favorable ankylosis of the entire cervical spine. Id. 

A 40 percent rating is assigned for unfavorable ankylosis of the entire cervical spine. Id.

The highest rating, 100 percent rating, is assigned for unfavorable ankylosis of entire spine. Id. Note (2) provides that normal forward flexion, extension, and left and right lateral flexion of the cervical spine are all zero to 45 degrees and left and right lateral rotation of the cervical spine are both zero to 80 degrees.

The regulations applicable to rating musculoskeletal disabilities require that VA must also consider the extent that a veteran may have additional functional impairment above and beyond the limitation of motion objectively demonstrated, such as during times when his symptoms are most prevalent ('flare-ups') due to the extent of his pain (and painful motion), weakness, premature or excess fatigability, and incoordination. DeLuca v. Brown, 8 Vet. App. 202, 204-7 (1995); see also 38 C.F.R. §§ 4.40, 4.45.

Intervertebral disc syndrome is rated either under the General Rating Formula or alternatively under the Formula for Rating Intervertebral Disc Syndrome Based on Incapacitating Episodes, pursuant to Diagnostic Code 5243, whichever method results in a higher disability rating. 

Under the Formula for Rating Intervertebral Disc Syndrome Based on Incapacitating Episodes, a 20 percent disability rating is warranted for incapacitating episodes having a total duration of at least two weeks but less than four weeks during the preceding 12 months. A 40 percent disability rating is warranted for incapacitating episodes having a total duration of at least four weeks but less than six weeks during the preceding 12 months. The maximum 60 percent disability rating is warranted for incapacitating episodes having a total duration of at least six weeks during the preceding 12 months. 38 C.F.R. § 4.71a, Diagnostic Code 5243. VA regulations provide that an incapacitating episode is a period of acute signs and symptoms due to intervertebral disc syndrome that requires bed rest prescribed by a physician and treatment by a physician. See Note (1). The Veteran was not diagnosed with IVDS of the cervical spine throughout the entire period on appeal.

For VA purposes, unfavorable ankylosis is a condition in which the entire thoracolumbar spine, or the entire spine is fixed in flexion or extension, and the ankylosis results in one or more of the following: difficulty walking because of a limited line of vision; restricted opening of the mouth and chewing; breathing limited to diaphragmatic respiration; gastrointestinal symptoms due to pressure of the costal margin on the abdomen; dyspnea or dysphagia; atlantoaxial or cervical subluxation or dislocation; or neurologic symptoms due to nerve root stretching. 38 C.F.R. § 4.71a, Diagnostic Code 5242, Note (5).

Turning to the evidence of record, a November 2017 VA examination report reflects that the Veteran has a diagnosis of degenerative arthritis of the spine. He reported constant pain but would get daily flare ups when the pain goes to 8 out of 10 (with 10 indicating the highest level of pain). He reported flare ups described as daily flare ups when the pain goes to an 8 out of 10. He reported functional loss/impairment described as less motion and more pain. Initial ROM testing revealed forward flexion to 30 degrees, extension to 30 degrees, right and left lateral flexion to 30 degrees, and right and left lateral rotation to 60 degrees. Range of motion itself contributed to a functional loss described as decreased ROM. Pain was noted on examination and caused functional loss. Range of motion exhibited pain on forward flexion, extension, right and left lateral flexion, and right and left lateral rotation. There was no evidence of pain with weight bearing. There was no objective evidence of localized tenderness or pain on palpation of the joint or associated soft tissue of the cervical spine. The Veteran was able to perform repetitive use testing with at least three repetitions with no additional loss of function or range of motion. The examiner could not say without mere speculation whether pain, weakness, fatigability, or incoordination significantly limited functional ability with repeated use over time. He explained that as the joint is repeatedly used over a period of time, such an opinion is not feasible and cannot be provided without resorting to mere speculation. He stated that any decrease in ROM with repeated use over time is merely speculative and highly subjective (on the Veteran's word alone) as neither he or any other medical provider is present to objectively and repetitively measure (with a goniometer) the change in ROM with repeated use over time. The Veteran denies objectively and repetitively measuring (with a goniometer) ROM with repeated use over time. The examiner also reported that he was unable to say without mere speculation whether pain, weakness, fatigability, or incoordination significantly limited functional ability with flare ups. He reported that such an opinion is not feasible and cannot be provided without resorting to mere speculation. He stated that any decrease in ROM during a flare-up is merely speculative and highly subjective (on the Veteran's word alone) s neither he nor any other medical provider is present to objectively and repetitively measure the change in ROM during a flare-up. He denied objectively and repetitively measuring flare-up range of motion. The examiner reported that he did not have guarding or muscle spasm. There was no muscle atrophy. The sensory examination was normal and there was no radicular pain or any other signs or symptoms of radiculopathy. There was no ankylosis and the Veteran did not have IVDS.

The April 2020 VA examination report reflects that the Veteran reported pain, stiffness, and soreness that has progressed/worsened. He reported that he had pain and stiffness with decreased flexibility. He reported flare-ups described as pain that would last a few days to a week during a flare up. He reported functional loss/impairment described as keeping one position in his neck interfering with his work because of pain. He reported limited range of motion side to side. Initial ROM revealed forward flexion that was normal (45 degrees). Extension was to 20 degrees, right lateral flexion was to 20 degrees, left lateral flexion was to 30 degrees, and right and left lateral rotation was to 45 degrees. Range of motion itself contributed to a functional loss described as decreased ROM preventing full turning of the head. Pain was noted on examination and caused functional loss. There was no evidence of pain with weight-bearing. He was able to perform repetitive use testing with at least three repetitions with no additional loss of function or ROM. Pain limited functional ability with repeated use over a period of time. The examiner was unable to describe this in terms of ROM. It was described as daily, would last for hours, mild, and the impact on function was decreased rotation of neck. Pain limited functional ability with flare ups. The examiner was unable to describe this in terms of ROM. It was described as daily, mild, would last for hours, precipitated by prolonged flexion of neck, alleviated by rest, and the impact on function was limited flexion. The Veteran did not have guarding or muscle spasm. He did not have muscle atrophy. The Veteran did not have radicular pain or any other signs or symptoms due to radiculopathy. There was no ankylosis of the spine. There was no IVDS of the cervical spine. He did not use assistive devices. There was no objective evidence of pain on non-weight bearing. Passive ROM for the neck and was the same as active ROM.

During the February 2021 Board hearing, the Veteran testified that he had pain radiating down the neck and the low back that impacts his work in that it is difficult to sit for any length of time and try to work. He testified that he is a dentist. The Veteran testified that his neck symptoms have worsened since the March 2020 VA examination. He testified that his job requires him to be in certain positions for extended periods of times and to use a machine and this is what causes pain down his neck and into his shoulders and arms. He clarified that his symptoms do not stop him from working. He testified that pain prevents him from moving his head sideways. He reported flare ups at work. 

In a May 2021 private examination report from Dr. M.S., she reported that she found unfavorable ankylosis of the entire cervical spine. She reported that the Veteran has endured heavy pressures to his neck during his military training, heavy physical lifts, pressure rapid movements, and repetitive motions. He also had to work with uncomfortable repetitive neck postures while performing his dental activities in training and as a dentist actively working on patients. She stated that this stressful and straining movements that were virtually constant have contributed, if not caused, the Veteran's cervical spine pathology. Range of motion revealed forward flexion to 15 degrees, with pain beginning at 15 degrees; extension to 10 degrees, with pain beginning at 10 degrees; right lateral flexion to 20 degrees with pain beginning at 20 degrees; left lateral flexion to 25 degrees with pain beginning at 25 degrees; and right rotation to 50 degrees, with pain beginning at 50 degrees and left rotation at 60 degrees, with pain beginning at 60 degrees. On active motion, there was moderate pain described as a 6 out of 10. On passive motion, there was mild to moderate pain described as 4 to 6 out of 10. There was pain with weight-bearing described as moderate severe with 7 to 9 out of 10 level of pain. There was pain without weight-bearing described as moderate and a 5 to 6 out of 10. The Veteran reported flare ups described as three times a week and would last for four hours. Functional loss during flare-ups were noted as no driving, no concentration or focus ability, and a need to recline. Dr. M.S. reported that his cervical spine disability impacts his ability to work. He is unable to work in normal workdays due to pain, stiffness, arm tingling, and numbness. She found that his cervical spine disability impacts his activities of daily living. The Veteran cannot drive for any distance beyond 15 to 20 minutes. He cannot sweep, mop, use a vacuum, clean his garage, or help with cooking. She reported that rigorous fitness is impossible. She found that the Veteran had a diagnosis of radiculopathy in bilateral upper extremities that results in paresthesias and/or dysesthesias and numbness that is more likely than not caused by (more than 50 percent certainty) the cervical spine disability. She reported that the exposure to intense military training followed by constant leaning postures in his dentistry professional work created a significant stress on his neck and shoulders. She reported that he had none of this prior to the military service. He had severe frequent headaches all since service activities. There is radiographic evidence of cervical degenerative disease reported by the Veteran. She concluded that chronic impact on cervical spine create multilevel degeneration with radiculopathy.

Initially, the Board finds that the May 2021 private examination report from Dr. M.S. is inconsistent with the evidence of record. Therefore, it is inadequate for adjudicating the claim. 

The November 2017 and May 2020 VA medical examination reports indicate that the Veteran had marked improvement of forward flexion. During the February 2021 Board hearing, the Veteran reported that he could still work which required him to be in the same position for an extended period of time, as well as use certain machines, with pain. This was just three months before his May 2021 private VA examination which marked that the Veteran had unfavorable ankylosis and forward flexion to 15 degrees. The May 2020 VA examination report noted that the Veteran's forward flexion was normal, 45 degrees, and there was no ankylosis. There was no indication from the Veteran during the Board hearing or VA treatment records that he experienced ankylosis or symptoms like limited line of vision, restricted opening of the mouth and chewing, or breathing limited to diaphragmatic respiration to indicate that he would have ankylosis whether favorable or unfavorable. As noted, during the February 2021 Board hearing, the Veteran testified that he was still working in his capacity as a dentist which would require him to turn his neck, albeit with pain, to continue to work. Dr. M.S. explained that she found unfavorable ankylosis due to heavy pressures on his neck from military training and his performance of dental activities. She did not indicate why she believed the Veteran had unfavorable ankylosis especially considering that he was able to perform ROM testing with improved rotation from his prior VA examinations. Furthermore, the November 2017 and May 2020 VA examinations reports specifically note that ROM testing was completed with the use of a goniometer. The May 2021 report from Dr. M.S. does not indicate how the ROM testing was conducted. Additionally, she did not indicate that she reviewed the claims file prior to her report or any indication as to why the Veteran's forward flexion decreased so drastically in such a short period of time. Therefore, the 2017 and 2020 VA examinations are afforded significant probative value as to the severity of the Veteran's cervical spine disability. See Nieves-Rodriguez, 22 Vet. App. at 304.

A rating in excess of 20 percent is not warranted at any time during the period on appeal under DC 5242. The record does not reflect either favorable ankylosis of the entire thoracolumbar spine or forward flexion of the cervical spine limited to 15 degrees or less. 

Throughout the entire period on appeal, the evidence shows that Veteran had persistent neck pain, flare ups, and symptoms more nearly approximating forward flexion greater than 15 degrees but not greater 30 degrees and total combined range of motion of the cervical spine not greater than 170 degrees. Throughout the entire period on appeal, the Veteran's symptoms were of such severity and frequency synonymous with the criteria currently assigned at 20 percent disabling. The Veteran's flare-ups were described as mild pain with less movement than normal and limited side-to-side movement due to pain that was precipitated by prolonged flexion of the neck. The Veteran was able to perform repetitive use testing with no additional loss of function or ROM. There was no ankylosis or guarding of the neck.

Finally, with respect to an evaluation for any associated neurological abnormalities, as discussed above, the Veteran's neuropathies have been associated with diabetes mellitus. While the May 2021 report from Dr. M.S. found radiculopathy in the bilateral upper extremities, the November 2017 and May 2021 VA examiners made specific findings, based on the Veteran's nerve studies and neurological examinations, that the Veteran did not have a diagnosis of radiculopathy. The Veteran's symptoms of tingling and numbness have already been attributed to his bilateral neuropathy of the upper extremities. Notably, Dr. M.S. did not reference the nerve conduction testing and neuropathy diagnosis when she reported that the Veteran had a radiculopathy diagnosis. Therefore, a finding of bilateral radiculopathy of the upper extremities would not be accurate.

As the preponderance of the evidence reflects that the symptoms of the Veteran's cervical spine disability do not more nearly approximate the criteria for a rating in excess of 20 percent for the entire period on appeal, the benefit of the doubt doctrine is not for application and an increased rating for the service-connected cervical spine disability is not warranted. 38 U.S.C. § 5107 (b); 38 C.F.R. § 4.3.

 

 

TIFFANY HANSON

Acting Veterans Law Judge

Board of Veterans' Appeals

Attorney for the Board Laroche, N.

The Board's decision in this case is binding only with respect to the instant matter decided. This decision is not precedential and does not establish VA policies or interpretations of general applicability. 38 C.F.R. § 20.1303.